## Exhibit A

**De Camara Affidavit**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------
PHYTO TECH CORP. d/b/a  BLUE CALIFORNIA,

                  **Plaintiff,**              Civil Action No.
                                               1:19-cv-09033-JGK

**v.**

**GIVAUDAN SA,**

                  **Defendant.**
---------------------------------------------------------------

## AFFIDAVIT OF ANDREW DE CAMARA IN SUPPORT OF LIQUIDATING TRUSTEE'S FINAL REPORT AND MOTION FOR APPROVAL OF THE TRUSTEE'S PROPOSED WIND UP AND DISSOLUTION OF BGN TECH, LLC

The undersigned, Andrew De Camara, certifies that I have personal knowledge of the matters set forth herein, and that the following statements set forth in this instrument are true and correct to the best of my knowledge, recollection and belief:

1. I am over 18 years of age and if called to testify at any hearing or trial of this matter, I could and would competently testify to the facts contained in this affidavit.

2. I respectfully submit this Affidavit in support of the *Liquidating Trustee's Final Report* (the "Final Report") *and Motion for Approval of the Trustee's Proposed Wind Up and Dissolution of BGN Tech, LLC* (the "Motion").[1]

3. I am currently employed as a Senior Managing Director at Sherwood Partners ("Sherwood").

4. During the course of this proceeding, in my capacity as Trustee, I engaged in significant efforts to coordinate a resolution of the disagreement between the BGN Members,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Final Report and Motion.

with respect to: (i) the appropriate Post-Dissolution License Agreement; (ii) certain definitions of "Core IP" described in the LLC Agreement; (iii) the appropriate manner in which to resolve an assertion by Givaudan that Blue Cal had improperly entered into a licensing agreement with BASF, for Blue Cal's sole benefit, with respect to intellectual property that was purportedly implicated by the LLC Agreement and (iv) the distribution of BGN's liquid assets.

5.      I prepared and facilitated the exchange of drafts of a proposed Post-Dissolution License Agreement, with related schedules designed to resolve the Members' dispute.  I elicited comments from each Member in an effort to move toward a Post-Dissolution License Agreement that is fair and reasonable.

6.      I received comments to the proposed Post-Dissolution License Agreement from each of the Members in January and February 2022. Realizing the Members had reached an impasse and would not agree on the terms of the proposed Post-Dissolution License Agreement, I directed my counsel to meet with counsel for each of the Members, and request that the Members provide a written statement providing the legal bases supporting their respective positions. I received submissions regarding the Member's legal and factual positions on February 25, 2022, and my counsel analyzed and assessed the Members' respective legal assertions and factual positions regarding their views of the appropriate, and purportedly required, post-dissolution distribution of the intellectual property assets.

7.      Based on the Members' submissions, supplemental materials provided by the Members, my analysis of the LLC Agreement and the Intellectual Property, and the advice and recommendations of my legal counsel, I proposed a compromised wind-up procedure on May 27, 2022. I advised the Members that if they failed to agree to the proposal, I would invoke the power and authority granted pursuant to the Appointment Order and file the Motion requesting

the approval of dissolution terms that I believe, based on my experience, and informed discretion, to be fair and reasonable, and in accord with the applicable agreements between the Members.

8.      After an extension of time requested by the Members, on June 9, 2022, Blue Cal advised that it would accept and agree to the proposed wind up. I understand that Givaudan did not object to the proposed distribution of the liquid assets of BGN, but it did object to the proposed treatment and distribution of the purported intellectual property assets of BGN, and in particular the proposal with respect to the scope of rights in the Post-Dissolution License Agreement.

9.      Prior to my appointment, BGN had approximately $469,000 in liquid assets which was deposited into the BGN Trust account in January of 2021. I was initially foreclosed from taking control of additional BGN cash which was held at East West Bank but which had been pledged as collateral for non-BGN debt due to certain actions Blue Cal had taken.  Such actions were subsequently remediated at my request and the balance of available funds in the amount of $10,115,000 were transferred into the BGN Trust account. During the course of this case, I have continued to make normal course payments including but not limited to BGN's accounting firm, information technology firm, CA State Taxes and Fees, Katten and Sherwood. I have been serving monthly invoices on counsel to both Members and have received no objections. I have been providing a summary of Katten's invoices to counsel to both Members on a monthly basis and have received no objections.  I can use existing cash to satisfy any outside creditors and will maintain an additional reserve for purposes of final administrative wind-down tasks such as tax return preparation. As of July 29, 2022 the trust account has a balance of approximately $9,998,000.  Attached to the Final Report and Motion as **Exhibit 1** is a Cash Flow

Statement in regards to the Liquidating Trust as of July 31, 2022. There are some intra-member obligations that remain outstanding (and which are not reflected on the Company's Balance Sheet), but by agreement of the Members, those are being satisfied by the proposed distribution of the liquid assets, and the credits and debits from each respective Member's distribution. The proposed distribution of the liquid assets is attached hereto as **Exhibit 2.**

10.     The primary difficulty in winding up and dissolving BGN has been with respect to assessing the intangible intellectual property assets of BGN. The primary dispute between the Members is regarding the scope of "Core IP" (which is specifically defined in the LLC Agreement), which further implicates the meaning of Natural Vanillin (which is not specifically defined in the LLC Agreement).

11.     I understand that Givaudan's position is that the definition of Core IP is broad, covering any and all IP related to natural vanillin as described in U.S. and European regulations, and that Blue Cal must grant it an exclusive right, even as to Blue Cal, to all such IP. Blue Cal's position is that the definition of Core IP is narrow, and implicates only the specific natural vanillin technology that was being developed and contributed by Blue Cal into BGN.

12.     Complicating the issue is that on May 6, 2019, Conagen, which is understood to be an affiliate of Blue Cal, entered into the BASF License, whereby Conagen agreed to, *inter alia* exclusively license to BASF certain natural vanillin IP in exchange for royalties. Givaudan's believes the BASF License is a violation of the LLC Agreement and that the natural vanillin IP licensed to BASF should be exclusively licensed to Givaudan in the Post-Dissolution License Agreement. Blue Cal's position is that the BASF License is not a violation of the LLC Agreement, and that the natural vanillin IP implicated in the BASF License is independent of the LLC Agreement and is not subject to the Post-Dissolution License Agreement.

13.     The Members could not agree on a Post-Dissolution License Agreement, which is required under the LLC agreement upon dissolution of the LLC.  I invited written submissions from both Members supporting their respective legal positions. The Members' counsel submitted those position statements on February 25, 2022, and my counsel reviewed the positions and further considered numerous other substantive conversations with the parties as well as other materials provided in writing, in order to make an independent assessment – if possible – of whether one party's position  was definitively  correct as a matter of law.

14.     My review of the Members' respective positions revealed a complicated set of circumstances that were not expressly contemplated by the LLC Agreement, including (1) factual issues surrounding the definition of Core IP in the LLC Agreement, (2) whether, regardless of the definition of Core IP, Conagen entering into the BASF License was a violation of the LLC Agreement; (3) how to assess damages assuming a presumed violation; and (4) practical issues regarding the time, effort, and complications that could emanate from resolving these questions. I concluded that even if Givaudan was correct, and Blue Cal had breached the LLC Agreement when Conagen entered into the BASF License, the claim for that breach would likely belong to BGN (and myself). I determined litigation would likely be necessary because Blue Cal expressed its intention to vigorously defend any claims related to the BASF License. I further determined that because of such complications, any litigation would take time and result in substantial expense. Based on my counsel's review and analysis of the dispute, there would be a meaningful risk that after all of the time and expense incurred by BGN in connection with its dissolution in pursuing such a claim, it might not be successful, and could obtain no recovery, or a limited recovery.  Further, any recovery by BGN would presumably become an asset of BGN,

which would then be split nearly equally between Blue Cal (49%) and Givaudan (51%). Accordingly, I made a determination that a compromise proposal was appropriate.

15.     I have exercised the discretion and authority provided to me with respect to the Appointment Order, and, with the help of my counsel, have prepared the proposed BGN Distribution Agreement (which is attached hereto as **Exhibit 3**) and the proposed Post-Dissolution License Agreement (which is attached hereto as **Exhibit 4**) as required by Section 13.07(b)(ii) of the LLC Agreement. The Post-Dissolution License Agreement provides an exclusive license to Givaudan for Core IP as defined therein and excludes any natural vanillin IP licensed by Conagen to BASF, which it must because natural vanillin IP licensed to BASF cannot also be exclusively licensed to Givaudan. Further, I will compromise any claim BGN might have against Blue Cal (if any) in exchange for the agreement reflected in the Post-Dissolution License Agreement that Blue Cal would provide a 50% distribution to Givaudan of any royalties received under the BASF License.

_____
Andrew De Camara, as Liquidating
Trustee of BGN Tech, LLC

Subscribed and sworn to before me this ___4___ day
of August, 2022, by __Andrew De Camara_____

_____
Notary Public

ELIE MINA
COMM. #2360980
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JUNE 13, 2025

Affidavit in Support of Final Report/Approval Motion

## **Exhibit 1 to De Camara Affidavit**

# BGN Tech, Inc.
## Liquidating Trust - Cash Flow Statement

### As of July 31, 2022

| Item | Amount |
|---|---|
| **Receipts** | |
| Initial Funds Transfer from Company Account [1] | $469,413 |
| Subsequent Funds Transfer from Company Account [2] | $10,115,106 |
| | |
| Total Receipts | $10,584,518 |
| | |
| **Disbursements** | |
| Cogency - Statutory Representation [3] | ($387) |
| East West Bank Fees [4] | ($1,644) |
| Icon - Information Technology Services [5] | ($1,710) |
| Chen & Sun - Accounting Services [6] | ($15,070) |
| Sherwood Partners - Liquidating Trustee and Sherwood Fees [7] | ($68,865) |
| Katten Muchin Rosenman LLP - Counsel to Liquidating Trustee [8] | ($498,368) |
| | |
| Total Disbursements | ($586,043) |
| | |
| Ending Cash | $9,998,475 |

Notes

1. Equals initial cash transferred from Company accounts in January 2021.
2. Equals subsequent cash transferred from Company accounts in February of 2021.
3. Represents annual fees for statutory representation in Delaware.
4. Fees associated with Trust account at East West Bank.
5. Fees associated with Microsoft Exchange Online IT Support Services.
6. Outside accounting firm which handles monthly preparation of financial statements and annual tax return preparation and filing.
7. Liquidating Trustee and Sherwood Billables as per invoices.  Amount includes expense reimbursement for:

| | |
|---|---|
| April 2021: DE Franchise Tax | $300.00 |
| April 2021: CA FTB Annual Filing | $818.40 |
| October 2021: FedEx | $27.85 |
| April 2022: CA FTB Annual Filing | $818.40 |
| May 2022: DE Franchise Tax | $300.00 |

8. Legal counsel to Liquidating Trustee.

**<u>Exhibit 2 to De Camara Affidavit</u>**

PRIVILEGED AND CONFIDENTIAL

ATTORNEY CLIENT COMMUNICATION - ATTORNEY CLIENT WORK PRODUCT

**BGN Tech, LLC**
**Distribution of Liquid Assets**

| TRUSTEE RECOMMENDATION | | |
|---|---|---|

**Section A: Aggregate Damage**

| | | |
|---|---|---|
| Principal 1: Sweegen | $ | 3,075,090 |
| Principal 2: Conagen | | 1,000,000 |
| Principal 3: BlueCal | | 1,176,555 |
| Total Principal | $ | 5,251,645 |
| | | |
| Interest 1: Sweegen (8%) [1] | $ | 572,219 |
| Interest 2: Conagen (8%) [1] | | 186,082 |
| Interest 3: BlueCal (8%) [1] | | 218,936 |
| Total Interest | $ | 977,238 |
| | | |
| Aggregate Damage | $ | 6,228,883 |

**Section B: Other Claims**

| | | |
|---|---|---|
| Patent Costs [2] | $ | 43,141 |
| Lien Issue - Professional Fees [3] | | - |
| Wire Transfer [4] | | 10,875 |
| Total Other Claims | $ | 54,016 |

**Section C: Cash Distribution**

| | | | |
|---|---|---|---|
| Cash (Est.) [5] | | $ | 9,500,000 |
| Less: Patent Costs | | | 43,141 |
| Less: Lien Professional Fees | | | - |
| Less: Wire Transfer | | | 10,875 |
| New Cash | A | | 9,456,859 |
| Plus: Aggregate Damage | B | | 6,228,883 |
| Net Cash | C = A + B | $ | 15,685,742 |
| | | | |
| *Givaudan* | | | |
| 49% of Net Cash | D = C x 49% | $ | 7,686,013 |
| Plus: Total Other Claims | E | | 54,016 |
| | | $ | 7,740,029 |
| | | | |
| Distribution: | | | |
| Givaudan | D + E | $ | 7,740,029 |
| BlueCal = $9.5M Cash (Est.) - Givaudan Distr. | | $ | 1,759,971 |

Notes:

[1] **Interest** - Calculated at 8% annually on principal amounts beginning June 18, 2018
(date complaints were filed) and ending October 14, 2020 (date Trustee's counsel was Court appointed).

[2] **Patent Costs** - Reflect invoices provided by Givaudan, which the Trustee has reviewed and determined
to be reimbursable. The invoices that were in foreign currencies have been converted to US dollars.

[3] **Lien Issue - Professional Fees** - Trustee has determined no offset at this time.

[4] **Wire Transfer** - On September 3, 2019, Givaudan wired funds to BGN Tech, LLC
incorrectly. As the funds were never returned to Givaudan, a full credit is applied.

[5] **Cash (Est.)** - As of May 15, 2022, cash balance equals approximately $10,070,000.
Analysis presumes beginning cash distribution amount of $9,500,000.
Beginning cash is estimated to be net of estimated Trustee fees, estimated Trustee's counsel fees
and administrative wind-down fees (tax returns, court filings).

**Exhibit 3 to De Camara Affidavit**

## BGN DISTRIBUTION AGREEMENT

This **BGN Distribution Agreement** (the "Agreement"), dated as of [_____] is made to distribute certain assets currently owned by BGN Tech LLC ("Company") to either Givaudan SA, a company existing under the laws of Switzerland ("Givaudan") or Phyto Tech Corp. d/b/a Blue California, a California corporation ("Blue Cal"), or both Givaudan and Blue Cal (each a "Recipient" and collectively "Recipients").

## RECITALS

**WHEREAS**, BGN Tech LLC was formed via that Limited Liability Company Agreement dated February 21, 2014 ("BGN Tech Agreement");

**WHEREAS**, pursuant to the BGN Tech Agreement, Company was formed and granted certain rights relating to IP and further developed IP over time;

**WHEREAS**, the Parties now intend to dissolve the Company and terminate the Company;

**WHEREAS**, the BGN Tech Agreement provides for the distribution of certain IP coincident with the dissolution of the Company and termination of the BGN Tech Agreement, subject to that certain post-termination license between Givaudan and Blue Cal dated [_____] ("Post-Termination License").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements provided herein, the Company distributes certain IP to Givaudan, Blue Cal, or both, subject to the terms and conditions defined herein:

## ARTICLE I

### Definitions

Section 1.01   Definitions. Capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in this Article I. Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. Capitalized terms not used in this Agreement shall have the respective meanings ascribed to them in the Post-Termination License Agreement.

"Affiliate" of a Person means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. The term "Affiliated" and similar variations shall have correlative meanings. For purposes of this Agreement, "control" (including with correlative meanings, the terms "controlling," "controlled by" or "under common control with") as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Blue Cal Contributed IP" means (a) all of the patents and patent applications owned or jointly-owned by Blue Cal and its Affiliates set forth on Schedule 2A hereto (the "Blue Cal Initial Contributed IP"); (b) all of the Intellectual Property owned or jointly owned by Blue Cal and its Affiliates set forth on Schedule 2B (collectively, the "Blue Cal Second Contributed IP"), including (i) all Trade

Secrets, Know-How, standard operating procedures, gene sequences and microbial strains related thereto, (ii) all of Blue Cal's and/or its Affiliates' interest in and to any Intellectual Property created in connection with the Joint Technology Development Agreement, dated as of July 1, 2012 as amended, made by and between Givaudan Flavors Corporation, a Delaware corporation, and Blue Cal, relating to the Cis-3-Hexenol (C3H) research program and (iii) all of Blue Cal's and/or its Affiliates' interest in and to any Intellectual Property created in connection with the Engineered Amycolatopsis microbial strain useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and (c) any other Intellectual Property owned by Blue Cal and its Affiliates that was assigned and contributed by Blue Cal to the Company pursuant to any additional contribution agreements entered into by Blue Cal, on the one hand, and the Company, on the other hand, after the Effective Date of the BGN Tech Agreement.

"Company Developed IP" means all Intellectual Property discovered, invented, developed, created or acquired by the Company (other than the Contributed IP), including Intellectual Property created or derived from the Blue Cal Contributed IP, the Givaudan Contributed IP, the Blue Cal Background Licensed IP and/or the Blue Cal Future Licensed IP.

"Givaudan Contributed IP" means Givaudan's equal and undivided interest in (i) the United States provisional patent application number US 61/898961 relating to Cis-3-Hexenol entitled: "Method of Using Lipase for Biosynthetic Production of Cis-3-Hexenol", (ii) the United States provisional patent application number US 61/747,682 entitled: "High Yield Biosynthesis of Ferulic Acid Using a Modified Caffeic Acid 3-O-methyltransferase" (iii) the PCT International patent application number PCT/US 13/78328 entitled: "Methods of Making Vanillin via Microbial Fermentation Utilizing Ferulic Acid provided by a Modified Caffeic Acid 3-O Methyltransferase", and (iv) Givaudan's right, title and interest in and to all Intellectual Property created in connection with the JTDA, including any and all Intellectual Property disclosed or included in the following document: Standard Operating Procedure of cis-3-Hexenol production from alpha-linoleic acid in Saccharomyces cerevisiae and Yarrowia lipolytica" dated June 6, 2014 by Hui Chen, Tim Seeback and Huimin Man.

"Person" means an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association or any other entity.

"Trustee" means Andre De Camara of Sherwood Partners, Inc. ("Sherwood") as appointed as the liquidating trustee of BGN with the powers and duties specified in the Order at Document 44 in Case 1:19-cv-09033-JGK in the United States District Court for the Southern District of New York and under 6 Del. C. § 18-803.

Section 1.02    Construction.

a.  For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions, and to Exhibits and other attachments, without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of, and Exhibits and other attachments to, this Agreement; (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection; (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation" (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (vii) reference to any law, rule or regulation means such law, rule or regulation as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including all rules and regulations promulgated thereunder, and reference to any section or other provision of any law, rule or regulation means that provision of such law, rule or regulation from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (viii) the word "Dollars" or "$" means Dollars of the United States of America; and (ix) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

b.  For purposes of this Agreement, any reference to a defined term in or provision of any Ancillary Agreement that shall have been terminated as of any date of determination shall, to the extent consistent with the substantive effect of such termination, be deemed to be a reference to such defined term or provision as in effect immediately prior to the termination of such Ancillary Agreement.

c.  For the purposes of this Agreement, although BGN Tech LLC would be an Affiliate and Controlled Affiliate of each of Givaudan and Blue Cal, the Parties have agreed that the Company shall not be treated as such for the purposes of this Agreement or any of the Ancillary Agreements.

## Article II

### Blue Cal Contributed IP

Section 2.01    Assignment of Blue Cal Contributed IP

a.  Subject to the Post-Termination License, the Company hereby assigns all right, title and interest in all assets that only qualify as Blue Cal Contributed IP to Blue Cal. Subject to the Post-Termination License, the Company hereby assigns an equal, undivided right title and interest in all assets that qualify as both Blue Cal Contributed IP and Givaudan Contributed IP to Blue Cal.

b.  To fully effectuate such assignment as to Blue Cal Contributed IP in the form of a patent or patent application, the Company will execute the assignment attached as Exhibit A as to each such patent and patent application identified in Schedules A-1 and A-2 thereto.

## Article III

### Givaudan Contributed IP

Section 3.01    Assignment of Givaudan Contributed IP

a.  The Company hereby assigns all right, title and interest in and to all assets that only qualify as Givaudan Contributed IP to Givaudan. The Company hereby assigns an equal, undivided right title and interest in and to all assets that qualify as both Givaudan Contributed IP and Blue Cal Contributed IP to Givaudan.

b.  To fully effectuate such assignment as to Givaudan Contributed IP in the form of a patent or patent application, the Company will execute the assignment attached as Exhibit B as to each such patent and patent application identified in Schedule B-1 thereto.

## Article IV

### Company Developed IP

Section 4.01    Assignment of Company Developed IP

a.  Subject to the Post-Termination License, the Company hereby assigns an equal, undivided, right title and interest in the Company Developed IP to each of Blue Cal and Givaudan such that the Company Developed IP shall be jointly owned by both Blue Cal and Givaudan.

## Article V

### Other Provisions

Section 5.01    No Obligations to Third Parties

The execution and delivery of this Agreement shall not be deemed to confer any rights upon any person or entity other than the parties hereto, or make any person or entity a third party beneficiary of this Agreement, or to obligate any person or entity other than the parties to this Agreement.

Section 5.02   Title

The Company's assignments under this Agreement are on an "AS IS" and "WHERE IS" basis, with no representations or warranties as to merchantability, fitness or use, and the Purchased Assets shall be subject to the Encumbrances.

a. **AS-IS SALE; DISCLAIMERS. IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, NEITHER COMPANY NOR TRUSTEE IS MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSIGNED ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

b. **ANY ASSET DISTRIBUTED UNDER THIS AGREEMENT IS MADE "AS IS, WHERE IS, WITH ALL FAULTS"** AND **ANY PERSON RECEIVING AN ASSET ASSIGNED BY THIS AGREEMENT AGREES AND ACCEPTS SUCH ASSET "AS IS, WHERE IS, WITH ALL FAULTS."  ANY RECIPIENT HAS NOT RELIED UPON AND WILL NOT RELY ON, AND NEITHER COMPANY NOR TRUSTEE IS LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE DISTRIBUTED ASSETS OR RELATING THERETO MADE OR FURNISHED BY THE COMPANY OR ITS REPRESENTATIVES INCLUDING BUT NOT LIMITED TO TRUSTEE TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. ANY RECIPIENT PERSON ALSO ACKNOWLEDGES THAT RECEIPT OF ANY SUCH ASSET TAKES INTO ACCOUNT THAT THE ASSETS ARE BEING DISTRIBUTED "AS IS, WHERE IS, WITH ALL FAULTS."**

c. **ANY RECIPIENT OF ASSETS UNDER THIS AGREEMENT FURTHER WARRANTS AND REPRESENTS TO COMPANY AND TRUSTEE THAT IT WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN RELATION TO THIS AGREEMENT AND NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF COMPANY OR TRUSTEE, OR EITHER OF THEIR AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO.**

d. **RECIPIENTS OF ASSETS ACKNOWLEDGE THAT SOME OF THE ASSETS ASSIGNED BY THIS AGREEMENT MAY CONTAIN THIRD-PARTY INTELLECTUAL PROPERTY THAT MAY HAVE BEEN LICENSED BY COMPANY OR OTHERWISE ACQUIRED BY COMPANY. RECIPIENT UNDERSTANDS THAT NEITHER COMPANY NOR TRUSTEE IS ABLE TO TRANSFER INTELLECTUAL PROPERTY BELONGING TO A THIRD-PARTY WITHOUT THE EXPRESS WRITTEN CONSENT OF THAT THIRD-PARTY, WHICH WILL NOT BE OBTAINED OR SOUGHT BY COMPANY OR TRUSTEE**

**AS A PART OF, OR CONDITION TO, THIS AGREEMENT. RECIPIENT SHALL ACCEPT FULL RESPONSIBILITY FOR COMMUNICATING WITH ANY SUCH THIRD-PARTIES WHOSE INTELLECTUAL PROPERTY MAY BE INCLUDED IN THE ASSETS TRANSFERRED HEREBY AND SHALL PAY ANY AND ALL LICENSING OR OTHER FEES, COSTS, EXPENSES OR CHARGES THAT MAY BE ASSOCIATED WITH USING ANY SUCH ASSETS**

Section 5.03    Taxes and any other Charges Related to the Transfer

The Recipient of an asset agrees to promptly pay all sales, transfer, use or other taxes, duties, claims or charges imposed on and/or related to the transfer of such asset under this Agreement by any tax authority or other governmental agency and to defend, indemnify and hold Company and Trustee harmless from and against any such taxes, duties, claims, or charges for payment thereof by any tax authority or other governmental agency. The Recipient agrees that it will pay to the appropriate governmental agency any sales tax resulting from the assignment of the assets under this Agreement within thirty days following the Effective Date, and will provide to Company and Trustee written proof of having made such sales tax payment within three business days of the date that such sales tax payment was made.

Section 5.04    Notices

Any notice required or permitted to be given under this Agreement shall be in writing and shall be personally delivered or sent by certified or registered United States mail, postage prepaid, or sent by a nationally recognized overnight express courier and addressed as follows:

(a)    If to Company:

BGN Tech LLC
c/o Andrew De Camara, Liquidating Trustee
Sherwood Partners, Inc.
1801 Century Park East, 25th Floor
Los Angeles, CA 90067

With copy to:

Katten Muchin Roseman LLP
50 Rockefeller Plaza
New York, NY 10020
Attention: David Crichlow

(b)    If to Blue Cal:

[_____]

(c)    If to Givaudan:

[_____]

Section 5.05    Entire Agreement

This Asset Purchase Agreement, the Exhibits hereto (which are incorporated herein by reference) and any agreements to be executed and delivered in connection herewith, together constitute the entire agreement and understanding between the parties and there are no agreements or commitments with respect to the transactions contemplated herein except as set forth in this Agreement. This Agreement supersedes any prior offer, agreement or understanding between the parties with respect to the transactions contemplated hereby.

Section 5.06    Amendment; Waiver

Any term or provision of this Agreement may be amended only by a writing signed by Company. The observance of any term or provision of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party to be bound by such waiver. No waiver by a party of any breach of this Agreement will be deemed to constitute a waiver of any other breach or any succeeding breach.

Section 5.07    No Third Party Beneficiaries

Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or to give any person, firm or corporation, other than the parties hereto, any rights or remedies under or by reason of this Agreement.

Section 5.08    Execution in Counterparts

For the convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Facsimile or electronically transmitted signatures to this Agreement shall be as valid and binding as a signed original.

Section 5.09    Benefit and Burden.

This Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by and against, the parties hereto and their respective successors and permitted assigns.

Section 5.10    Governing Law; Jurisdiction; Service of Process

This Agreement and all claims and causes of action (whether in contract, tort or otherwise) shall be governed by and shall be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF

DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

The Parties hereby agree that any legal action, suit or proceeding arising out of or relating to this Agreement, or the breach, termination or validity thereof, shall be instituted in any state or federal court in the State of New York located in the County of New York. Each Party agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement, the agreements contemplated hereby or the subject matter hereof or thereof may not be enforced in or by such court. Each Party further irrevocably submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any Party if given by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such Party as herein provided.

Section 5.11    Severability

If any provision of this Agreement is for any reason and to any extent deemed to be invalid or unenforceable, then such provision shall not be voided but rather shall be enforced to the maximum extent then permissible under then applicable law and so as to reasonably effect the intent of the parties hereto, and the remainder of this Agreement will remain in full force and effect.

Section 5.12    Limitation of Liability

ANY RECIPIENT OF AN ASSET HEREBY RECOGNIZES, ACKNOWLEDGES AND AGREES THAT UNDER NO CIRCUMSTANCE MAY IT OR ANY OF ITS AFFILIATES ASSERT ANY CLAIM AGAINST OR SEEK ANY RECOVERY FROM THE TRUSTEE OR ANY OFFICERS, DIRECTORS, MEMBERS, AGENTS, MANAGERS, REPRESENTATIVES OR EMPLOYEES OF THE TRUSTEE OR THE COMPANY OR ANY OF THE OFFICERS, DIRECTORS, MEMBERS, AGENTS, MANAGERS, REPRESENTATIVES OR EMPLOYEES OF ANY MEMBER OR AFFILIATE OF COMPANY OR TRUSTEE ON ACCOUNT OF ANY ACTION OR INACTION OR FOR ANY REASON WHATSOEVER RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, AS A RESULT OF, ARISING OUT OF, OR IN ANY WAY RELATING TO ANY BREACH OF ANY REPRESENTATION, WARRANTY AGREEMENT OR COVENANT MADE BY OR TO BE PERFORMED BY COMPANY UNDER THIS AGREEMENT.

Section 5.13   <u>No Liability  of Trustee</u>

ANY RECIPIENT OF ANY ASSET HEREUNDER SHALL HAVE NO CLAIM , OR ENTITLEMENT TO ANY REMEDY, AGAINST TRUSTEE.

*[signature pages to come]*

**SCHEDULE 2A**

| | | |
|---|---|---|
| **US 61/899456** | High yield biosynthesis of Ferulic Acid from Eugenol using a Plant Dehydrogenase | 4 November 2013 |
| **US61/747,682** | High yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase | 31 December 2012 |
| **PCT/US13/78328 PCT International Patent Application** | Methods of making vanillin via microbial fermentation utilizing Ferulic Acid provided by a modified caffeic acid 3-O-Methyltransferase | 30 December 2013 |
| **[CN102321563B] Granted CN patent**<br><br>**US2013/0115667 A1 Pending US patent application**<br><br>**US13/591,231 US Provisional Patent Application** | Amycolatopsis Sp, strain and methods of using the same for vanillin production | CN priority date is 24 October 2011<br><br>US Filing date is 22 August 2012 |
| **US61/898,961 US Provisional Patent Application** | Method of using Lipase for Biosynthetic Production of Cis-3-Hexenol | 1 November 2013 |

## SCHEDULE 2B

<u>Wholly-Owned Blue Cal IP</u>

1. All Intellectual Property, Trade Secrets and Know-How relating to the starting materials, method for marking, methods of using, methods of purifying, downstream processing of and compositions comprising Natural Vanillin and Cis-3-Hexenol, including:

   a. Any Intellectual Property disclosed in or relating to the "Standard Operating Procedure" documents for the following four processes:

      i. Process I: extraction of Ferulic Acid (FA) from Corn;

      ii. Process II: bioconversion of p-coumaric acid to caffeic acid to Ferulic Acid (FA);

      iii. Process III: bioconversion of Eugenol to Ferulic Acid; and

      iv. Process IV: bioconversion of Ferulic Acid (FA) to Natural Vanillin (NV);

   b. The following microbial strains located in the Chinese Cell and Tissue Culture Collection, including any Intellectual Property therein or appurtenant thereto:

      i. CCTCC M 2011265;

      ii. CGMCC 7.176;

      iii. CGMCC 7.177; and

      iv. CGMCC 7.178;

2. All Intellectual Property created in connection with the Engineered Amycolatopsis microbial strain useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and

3. To the extent not already included in the Blue Cal Initial Contributed IP, any Know-How included in any revisions or supplements to the following patent application:

| Patent No | Patent Title | Filing Date | Company Product |
|---|---|---|---|
| **US 61/899456** | High yield biosynthesis of Ferulic Acid from Eugenol using a Plant Dehydrogenase | 4 November 2013 | Natural Vanillin (NV) |

<u>Co-Owned Blue Cal IP</u>

1. Blue Cal's right, title and interest in and to all Intellectual Property created in connection with the JTDA, including any and all Intellectual Property disclosed or included in the following document: Standard Operating Procedure of cis-3-Hexenol production from alpha- linoleic acid in Saccharomyces cerevisiae and Yarrowia lipolytica" dated June 6 2014 by Hui Chen, Tim Seeback and Huimin Man; and

2. To the extent not already included in the Blue Cal Initial Contributed IP, any Know-How included in any revisions or supplements to the following patent application:

| Patent No | Patent Title | Filing Date | Company Product |
|---|---|---|---|
| **US61/898961 US Provisional Patent Application** | Method of using Lipase for Biosynthetic Production of Cis- 3-Hexenol | 1 November 2013 | Cis-3-Hexenol (C3H) |

**EXHIBIT A**

**[Patent Assignment BGN to Blue Cal]**

# PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT ("Patent Assignment"), dated as of [●], is made by BGN Tech LLC ("BGN"), a Delaware Limited Liability Company, in favor of Phyto Tech Corp. d/b/a Blue California ("Blue Cal"), a California Corporation, the recipient of certain assets of BGN[s] pursuant to that certain BGN DISTRIBUTION AGREEMENT, dated as of [●].

WHEREAS, under the terms of the BGN DISTRIBUTION AGREEMENT, BGN has assigned to Blue Cal, among other assets, certain intellectual property of BGN subject to that certain Post-Termination License Agreement, and has agreed to execute and deliver this Patent Assignment, for recording with the United States Patent and Trademark Office;

NOW THEREFORE, the parties hereto agree as follows:

Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and all rights assigned subject to that certain Post-Termination License Agreement, BGN hereby assigns to Blue Cal, and Blue Cal hereby accepts:

(a)     all of BGN's right, title, and interest in and to the following patents and patent applications set forth in Schedule A-1 attached hereto, and an equal, undivided right, title and interest in and to the following patents and patent applications set forth in Schedule A-2, including for both sets all issuances, divisions, continuations, continuations-in-part, reissues, extensions, substitutions, reexaminations, and renewals thereof (the "Patents");

(b)     all rights (for Schedule A-1) or equal undivided rights (for Schedule A-2) of any kind whatsoever of BGN accruing under any of the foregoing provided by applicable law of any jurisdiction throughout the world;

(c)     any and all (for Schedule A-1) or equal undivided (for Schedule A-2) rights to any royalties, fees, income, payments, and other proceeds now or hereafter due or payable to BGN with respect to any and all of the foregoing except for those addressed in that certain Post-Termination License Agreement; and

(d)     any and all (for Schedule A-1) or equal undivided (for Schedule A-2) claims and causes of action that BGN possesses or would posses with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

Recordation and Further Actions. BGN hereby authorizes the Commissioner for Patents in the United States Patent and Trademark Office to record and register this Patent Assignment upon request by Blue Cal. Following the date hereof, upon Blue Cal's reasonable request, and at Blue Cal's sole cost and expense, BGN shall take such steps and actions, and provide such cooperation and assistance to Blue Cal and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned Patents to Blue Cal, or any assignee or successor thereto.

Terms of the BGN Distribution Agreement and Post-Termination License. The parties hereto acknowledge and agree that this Patent Assignment is entered into pursuant to the BGN Distribution Agreement and subject to the Post-Termination License, to which reference is made for a further statement of the rights and obligations of BGN and Blue Cal with respect to the Assigned Patents. The representations, warranties, covenants, and agreements contained in the BGN Distribution Agreement and Post-Termination License shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the BGN Distribution Agreement or Post-Termination License and the terms hereof, the terms of the BGN Distribution Agreement or Post-Termination License shall govern.

Counterparts. This Patent Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Patent Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Patent Assignment.

Successors and Assigns. This Patent Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Governing Law. This Patent Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Patent Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, BGN has duly executed and delivered this Patent Assignment as of the date first above written.

[NAME OF BGN]

By:
_____
Name:
Title:

ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

On the _____ day of _____, 2022, before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that [he/she] executed the same [in [his/her] authorized capacity as the [SIGNATORY TITLE] of BGN, the Limited Liability Company described, and acknowledged the instrument to be [[his/her] free act and deed/the free act and deed of BGN for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:

My Commission
Expires:_____

AGREED TO AND ACCEPTED:

[NAME OF BLUE CAL]

By:

_____
Name:
Title:

ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

On the _____ day of _____, 2022, before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that [he/she] executed the same [in [his/her] authorized capacity as the [SIGNATORY TITLE] of Blue Cal, the Corporation described, and acknowledged the instrument to be [[his/her] free act and deed/the free act and deed of Blue Cal for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:

My Commission Expires:
_____

## SCHEDULE A-1

| Type | Grant # | Application # | Title |
|------|---------|---------------|-------|
| PCT/CN | 106,103,724B | 201480060464X | Biosynthesis of Ferulic Acid from Eugenol |
| PCT/EP | 3,066,206 | 14802286.6 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT-EP-CH | 3,066,206 | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT-EP-DE | 602014037927.3 | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT-EP-FR | 3,066,206 | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT-EP-GB | 3,066,206 | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT-EP-NL | 3,066,206 | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| NP/HK | 1,226,445 | 16114733.5 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT/IN | 347,620 | 201647015455 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT/JP | 6,596,009 | 2016-553222 | Biosynthesis of Ferulic Acid from Eugenol |
| PCT | | PCT/US2014/063952 | Biosynthesis of Ferulic Acid from Eugenol |
| U.S. Provisional | | 61/899,456 | Biosynthesis of Ferulic Acid from Eugenol |
| U.S. Patent | 9,932,610 | 15/033,980 | Biosynthesis of Ferulic Acid from Eugenol |
| U.S. Patent | 10,428,356 | 15/879341 | Biosynthesis of Ferulic Acid from Eugenol |
| China Patent | 102,321,563B | 201110325488.1 | Natural Vanillin |
| U.S. Application | | US2013/0115667A | |
| U.S. Patent | 9,115,377 | 13/591,231 | Natural Vanillin |
| U.S. Patent | 9,758,759 | 14/800,261 | Natural Vanillin |
| U.S. Patent | 9,822,335 | 15/602,606 | Natural Vanillin |
| U.S. Patent | 10,351,817 | 15/787,372 | Natural Vanillin |

| Application | | US201261747682 | METHODS OF MAKING VANILLIN VIA MICROBIAL FERMENTATION UTILIZING FERULIC ACID PROVIDED BY A MODIFIED CAFFEIC ACID 3-O-METHYLTRANSFERASE |
|---|---|---|---|

**SCHEDULE A-2**

| Type | Grant # | Application # | Title |
|---|---|---|---|
| U.S. Provisional | | 61/898961 | Method of using lipase for biosynthetic production of cis-3-hexenol |
| U.S. Provisional | | 61/747,682 | High-yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase |
| PCT | | PCT/US2013/078328 | High-yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase |

**EXHIBIT B**

**[Patent Assignment BGN to Givaudan]**

US_153227170v1

# PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT ("Patent Assignment"), dated as of [●], is made by BGN Tech LLC ("BGN"), a Delaware Limited Liability Company, in favor of Givaudan SA, a company existing under the laws of Switzerland ("Givaudan"), the recipient of certain assets of BGN[s] pursuant to that certain BGN DISTRIBUTION AGREEMENT, dated as of [●].

WHEREAS, under the terms of the BGN DISTRIBUTION AGREEMENT, BGN has assigned to Givaudan, among other assets, certain intellectual property of BGN and has agreed to execute and deliver this Patent Assignment, for recording with the United States Patent and Trademark Office;

NOW THEREFORE, the parties hereto agree as follows:

Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and all rights assigned subject to that certain Post-Termination License Agreement, BGN hereby assigns to Givaudan, and Givaudan hereby accepts,:

(a) An equal undivided right title and interest of BGN's right, title, and interest in and to the following the patents and patent applications set forth in Schedule B-1 attached hereto and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, substitutions, reexaminations, and renewals thereof (the "Patents");

(b) Equal undivided rights of any kind whatsoever of BGN accruing under any of the foregoing provided by applicable law of any jurisdiction throughout the world;

(c) Equal undivided rights to any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing except for those addressed in that certain Post-Termination License Agreement; and

(d) Equal undivided rights to any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

Recordation and Further Actions. BGN hereby authorizes the Commissioner for Patents in the United States Patent and Trademark Office to record and register this Patent Assignment upon request by Givaudan. Following the date hereof, upon Givaudan's reasonable request, and at Givaudan's sole cost and expense, BGN shall take such steps and actions, and provide such cooperation and assistance to Givaudan and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned Patents to Givaudan, or any assignee or successor thereto.

Terms of the BGN Distribution Agreement and Post-Termination License. The parties hereto acknowledge and agree that this Patent Assignment is entered into pursuant to the BGN Distribution Agreement and subject to the Post-Termination License, to which reference is made for a further statement of the rights and obligations of BGN and Givaudan with respect to the Assigned Patents. The representations, warranties, covenants, and agreements contained in the BGN Distribution Agreement and Post-Termination License shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the BGN Distribution Agreement or Post-Termination License and the terms hereof, the terms of the BGN Distribution Agreement or Post-Termination License shall govern.

Counterparts. This Patent Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Patent Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Patent Assignment.

Successors and Assigns. This Patent Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Governing Law. This Patent Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Patent Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, BGN has duly executed and delivered this Patent Assignment as of the date first above written.

[NAME OF BGN]

By:

_____

Name:

Title:

ACKNOWLEDGMENT

STATE OF _____

COUNTY OF _____

On the _____ day of _____, 2022, before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that [he/she] executed the same [in [his/her] authorized capacity as the [SIGNATORY TITLE] of BGN, the Limited Liability Company described, and acknowledged the instrument to be [[his/her] free act and deed/the free act and deed of BGN for the uses and purposes mentioned in the instrument.

_____

Notary Public

Printed Name:

My Commission

Expires:_____

AGREED TO AND ACCEPTED:

[NAME OF GIVAUDAN]

By:

_____
Name:
Title:

ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____

On the _____ day of _____, 2022, before me personally appeared [SIGNATORY NAME], personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument, who, being duly sworn, did depose and say that [he/she] executed the same [in [his/her] authorized capacity as the [SIGNATORY TITLE] of Givaudan, the Corporation described, and acknowledged the instrument to be [[his/her] free act and deed/the free act and deed of Givaudan for the uses and purposes mentioned in the instrument.

_____
Notary Public
Printed Name:

My Commission Expires:
_____

**SCHEDULE B-1**

| Type | Grant # | Application  # | Title |
|---|---|---|---|
| U.S. Provisional | | 61/898961 | Method of using lipase for biosynthetic production of cis-3-hexenol |
| U.S. Provisional | | 61/747,682 | High-yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase |
| PCT | | PCT/US2013/078328 | High-yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase |

**Exhibit 4 to De Camara Affidavit**

## Post-Termination License Agreement

This **Post-Termination License Agreement** (the "Agreement") is made and entered into as of [_____] (the "Effective Date"), by and among Givaudan SA, a company existing under the laws of Switzerland ("Givaudan") and Phyto Tech Corp. d/b/a Blue California, a California corporation ("Blue Cal"), collectively the "Parties".

### RECITALS

**WHEREAS**, Givaudan and Blue Cal previously entered into that Limited Liability Company Agreement of BGN Tech LLC, dated February 21, 2014 ("BGN Tech Agreement");

**WHEREAS**, pursuant to the BGN Tech Agreement, BGN Tech LLC (the "Company") was formed and granted certain rights relating to IP;

**WHEREAS**, the Parties now intend to dissolve the Company and terminate the Company;

**WHEREAS**, the BGN Tech Agreement provides for the distribution and licensing of certain IP coincident with the dissolution of the Company and termination of the BGN Tech Agreement;

**WHEREAS**, Givaudan and Blue Cal wish to agree to the terms and conditions of a post-termination license, as such license is described in Section 13.07(b)(ii) of the BGN Tech Agreement, and this Agreement shall comprise the terms and conditions of the post-termination license; and

**WHEREAS**, concurrently with the execution of this Agreement, Givaudan and Blue Cal intend to agree to the terms and conditions of the post-termination distribution of certain IP, which shall be separately set forth in the BGN Distribution Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements provided herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound, hereby agree as follows:

### ARTICLE I

### Definitions

Section 1.01   Definitions.  Capitalized terms used in this Agreement shall have the respective meanings ascribed in this Article I.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meanings ascribed throughout this Agreement.

"Affiliate" of a Person means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. The term "Affiliated" and similar variations shall have correlative meanings. For purposes of this Agreement, "control" (including with correlative meanings, the terms "controlling," "controlled by" or "under common control with") as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, no Person shall be an Affiliate of another Person solely by virtue of any past or present membership interest in the Company.

"Ancillary Agreement" means the Blue Cal Initial IP Contribution Agreement, the Blue Cal Second IP Contribution Agreement, the Givaudan IP Contribution Agreement, any Blue Cal Background Licensed IP License, any Blue Cal Future Licensed IP License and the Blue Cal Services Agreement.

"BGN Distribution Agreement" means the Distribution Agreement, dated [_____], between the Company, Blue Cal, and Givaudan assigning certain IP rights from the Company to either Givaudan or Blue Cal, such BGN Distribution Agreement being subject to the terms of this Agreement.

"Blue Cal Background Licensed IP" means any and all Intellectual Property owned by Blue Cal or its Affiliates (other than the Blue Cal Contributed IP and any Blue Cal Future Licensed IP), including the Intellectual Property set forth on Schedule 1, that was licensed to the Company on a worldwide, transferable, royalty-free, sublicensable, nonexclusive basis within the Field to use such Blue Cal Background Licensed IP, for so long as the Company existed.

"Blue Cal Contributed IP" means (a) all of the patents and patent applications owned or jointly-owned by Blue Cal and its Affiliates set forth on Schedule 2A hereto (the "Blue Cal Initial Contributed IP"); (b) all of the Intellectual Property owned or jointly owned by Blue Cal and its Affiliates set forth on Schedule 2B (collectively, the "Blue Cal Second Contributed IP"), including (i) all Trade Secrets, Know-How, standard operating procedures, gene sequences and microbial strains related thereto, (ii) all of Blue Cal's and/or its Affiliates' interest in and to any Intellectual Property created in connection with the Joint Technology Development Agreement,

2

dated as of July 1, 2012 as amended, made by and between Givaudan Flavors Corporation, a Delaware corporation, and Blue Cal, relating to the Cis-3-Hexenol (C3H) research program and (iii) all of Blue Cal's and/or its Affiliates' interest in and to any Intellectual Property created in connection with the Engineered Amycolatopsis microbial strain useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and (c) any other Intellectual Property owned by Blue Cal and its Affiliates that was assigned and contributed by Blue Cal to the Company pursuant to any additional contribution agreements entered into by Blue Cal, on the one hand, and the Company, on the other hand, after the Effective Date of the BGN Tech Agreement.

"Blue Cal Future Licensed IP" means any and all Intellectual Property on the Effective Date of the BGN Tech Agreement or thereafter owned, co-owned, controlled, or in-licensed by Blue Cal or its Affiliates relating to Natural High Intensity Sweeteners and Sweetener Modifiers (e.g., RebE, RebM), Liquorice, Raspberry Ketone, and/or Theanine (other than the Blue Cal Contributed IP and the Blue Cal Background Licensed IP), including the Intellectual Property set forth on Schedule 3, that Blue Cal licensed to the Company on a worldwide, transferable, royalty-free, sublicensable, exclusive basis within the Field to use such Blue Cal Future Licensed IP, for so long as the Company existed.

"Blue Cal Initial IP Contribution Agreement" means the agreement, dated as of February 21, 2014, entered into by and between Blue Cal and the Company, pursuant to which the Blue Cal Initial Contributed IP was assigned and contributed to the Company.

"Blue Cal Second IP Contribution Agreement" means the agreement, dated as of September 3, 2014, entered into by and between Blue Cal and the Company, pursuant to which the Blue Cal Second Contributed IP was assigned and contributed to the Company.

"Blue Cal Services Agreement" means the agreement pursuant to which Blue Cal's obligations with respect to the research and development services that it was planned to provide to the Company in furtherance of the Company's purpose were set forth as one of the conditions precedent for first Givaudan Milestone Payment which is provided in Schedule D-1 to the BGN LLC Agreement.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banking institutions in Geneva, Switzerland, New York, New York or Los Angeles, California are authorized or required by law or executive order to close.

"Commercial Exploitation" or "Commercially Exploit" means to make, have made, import, use, sell or offer for sale, including to research, develop, commercialize, register, submit for regulatory approval, promote or market.

"Company Developed IP" means all Intellectual Property discovered, invented, developed, created or acquired by the Company (other than the Contributed IP), including Intellectual Property created or derived from the Blue Cal Contributed IP, the Givaudan Contributed IP, the Blue Cal Background Licensed IP and/or the Blue Cal Future Licensed IP.

"Contributed IP" means, collectively, the Blue Cal Contributed IP and the Givaudan Contributed IP.

"Controlled Affiliate" means, with respect to any Person, any Affiliate of such Person that is directly or indirectly, through one or more intermediaries, controlled by such Person.

"Core IP" means any Intellectual Property owned by Blue Cal or its Affiliates upon dissolution of the Company that is related to Natural Vanillin, Cis-3-Hexenol and Juno, including the Blue Cal Contributed IP, except for the IP specifically identified in the BASF License. For the avoidance of doubt, upon dissolution of the Company includes any rights assigned to Blue Cal or its Affiliates pursuant to the BGN Distribution Agreement but does not Intellectual Property developed after the dissolution of the Company.

"Cosmetics" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) useful in promoting or maintaining, improving or enhancing the appearance of the human body, including products that are applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance without affecting the body's structure or functions. For the

avoidance of doubt, a Cosmetic or any part thereof may also qualify as a Functional Ingredient or a Nutraceutical.

"Field" means the field of Flavours, Fragrances, Cosmetics, Nutraceuticals, Functional Ingredients and Functional Food and Drinks and any combinations thereof, including the Commercial Exploitation of such Flavours, Fragrances, Cosmetics, Nutraceuticals, Functional Ingredients and Functional Foods and Drinks and any combinations thereof, but excluding pharmaceuticals and medical diagnostics.

"Flavours" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto), including Flavour Modifiers, useful to impart flavour to and/or mask flavor of materials designed for human consumption or animal feeding (including food, beverages, drugs and tobacco).

"Flavour Modifier" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) which increase, augment, intensify, accentuate, reduce, mask, re-balance or magnify the sensory perception of one or more flavour characteristics of an orally consumable product without changing the nature or quality thereof.

"Fragrances" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, Ingredients, molecules, compositions and mixtures of compounds, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) useful to impart scent to or mask odour of a wide range of products (including fine fragrances, cosmetics, toiletries, detergents, air fresheners, soaps and other consumer products).

"Fragrance Modifier" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery

systems and methods of making anything related thereto) which increase, augment, intensify, accentuate, reduce, mask, re-balance or magnify the sensory perception of one or more scent or odour characteristics of a consumer product without changing the nature
or quality thereof.

"Functional Food and Drinks" means any and all foods or drinks that have a potentially positive effect on health beyond basic nutrition, including dairy products, juice, readymade liquids for drinking, spreadable products such as a margarine or a vegetable or plant extracted oil, cereal products, such as traditional breakfast cereal products, nutritional bars, biscuits, bread, soups, meat products, meat-substitute products, and vegetable products.

"Functional Ingredient" means an Ingredient, food or part of a food, which may provide medicinal or health benefits including any of the following: a carotenoid, dietary fiber, fatty acid, saponin, antioxidant, flavonoid, isothiocyanate, phenol, polyphenol (such as Resveratrol), plant sterol or stanol (phytosterols and phytostanols), a polyol, a prebiotic, a probiotic, a phytoestrogen, soy protein, sulfides/thiol, amino acid, a protein, a vitamin, a mineral, saponins, antioxidants, dietary fiber sources, fatty acids, vitamins, glucosamine, minerals, preservatives, hydration agents, probiotics, prebiotics, edible gelling ingredients, edible Gel mixes and Gel compositions, Weight Management Agents, osteoporosis management agents, phytoestrogens, long chain primary aliphatic saturated alcohols, phytosterols and combinations thereof and/or a substance classified based on a health benefits, such as cardiovascular, cholesterol-reducing or anti-inflammatory.

"Further IP" means any Intellectual Property that is (a) developed and owned by either Blue Cal or Givaudan and (b) derived from the Company Developed IP by either Blue Cal or Givaudan after the dissolution of the Company.

"Givaudan Contributed IP" means Givaudan's equal and undivided interest in (i) the United States provisional patent application number US 61/898961 relating to Cis-3-Hexenol entitled: "Method of Using Lipase for Biosynthetic Production of Cis-3-Hexenol", (ii) the United States provisional patent application number US 61/747,682 entitled: "High Yield Biosynthesis of Ferulic Acid Using a Modified Caffeic Acid 3-O-methyltransferase" (iii) the PCT International patent application number

PCT/US 13/78328 entitled: "Methods of Making Vanilin via Microbial Fermentation Utilizing Ferulic Acid provided by a Modified Caffeic Acid 3-O Methyltransferase", and (iv) Givaudan's right, title and interest in and to all Intellectual Property created in connection with the JTDA, including any and all Intellectual Property disclosed or included in the following document: Standard Operating Procedure of cis-3-Hexenol production from alpha-linoleic acid in Saccharomyces cerevisiae and Yarrowia lipolytica" dated June 6, 2014 by Hui Chen, Tim Seeback and Huimin Man.

"Givaudan IP Contribution Agreement" means the Givaudan Contribution Agreement, dated as of February 21, 2014, by and between Givaudan and the Company, pursuant to which Givaudan's equal and undivided interest in the Givaudan Contributed IP was assigned and contributed to the Company.

"Gel" means a colloidal system in which a network of particles spans the volume of a liquid medium and exhibits densities similar to liquids, but has a structural coherence of solids due to the network of particles that span the liquid medium and generally appear to be solid, jelly-like materials, including gelatin, alginate, carrageenan, gum, pectin, konjac, agar, food acid, rennet, starch, starch derivatives, guar gum, gum arabic, pectins, xanthan gum, gellan gum, tara gum, psylium seed husk gum and locust bean gum or any combinations thereof.

"Ingredient" means any component part of a mixture or a preparation.

"Intellectual Property" means all worldwide (i) inventions whether or not patentable; (ii) patents and patent applications, together with all divisions, continuations, continuations-in-part, extensions and reexaminations thereof; (iii) trademarks, service marks, trade dress, logos, domain names and trade names, whether or not registered, and all goodwill associated therewith; (iv) copyrights, mask works and related rights, whether or not registered; (v) computer software, data, databases, files, and documentation and other materials related thereto; (vi) Trade Secrets, Know-How, confidential technical and business information, customer and supplier lists, and all personally-identifiable information; (vii) all other rights, of any nature, similar to the foregoing; and (ix) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"IP Arbitration Procedures" means the following process: (i) after such relevant thirty (30) day period has lapsed, Givaudan may provide Blue Cal with notice of its election to have a three (3)-person arbitration panel (the "Panel") determine the applicable additional terms and, within five (5) days of delivery of such notice to Blue Cal, each of Blue Cal and Givaudan shall select one arbitrator, and, within five (5) days thereof, the two arbitrators selected by the Parties shall select the third arbitrator; (ii) the arbitration shall be held in Boston, Massachusetts, shall be conducted in English, pursuant to American Arbitration Association arbitration rules in force at the time of the arbitration; (iii) this arbitration must be concluded within any period mutually agreed upon by the Parties or if there is no such agreement, then within sixty (60) days after the selection of the arbitrators; (iv) the arbitral award shall be in writing and shall be final and binding on the Parties; and (v) any arbitral award may be enforced through any court having jurisdiction over the Parties.

"JTDA" means that certain Joint Technology Development Agreement between Givaudan Flavors Corporation, a Delaware corporation and Affiliate of Givaudan, and Blue call dated as of July 1, 2012, as amended, relating to the Cis-3-Hexenol (C3H) research program.

"Juno" means the Stevia Extract Product containing Rebaudioside A (RebA) at levels between approximately 16-22%, a stevioside/RebA ratio of approximately 2.7-3.3, and a total stevioglycoside content below approximately 88% as prepared and described in the Givaudan Analytical Report dated 18 April 2013 which is provided in Schedule 4. Representative examples of two Juno Products which satisfy the above criteria are designed in the Givaudan Analytical Report as FL-131768 and FL-131872.

"Know-How" means any research information, technical information, technical data or other information, including all unpatented and/or unpatentable inventions, technology, cell lines, microbes, microbial strains (e.g., wild type or genetically engineered), molecules, either captive or in the course of production, biological material, compounds, probes, sequences and methodologies.

"Natural Vanillin" means any natural Vanillin flavoring as defined under the regulatory framework of either the United States or European Union as of the Effective Date of this Agreement.

"Non-Core IP" means any Intellectual Property (other than any Company Developed IP and any Core IP) that was either licensed to or owned by the Company during the life of the Company and is owned by Blue Cal or its Affiliates after the dissolution of the Company.

"Nutraceutical" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) that may provide medicinal, health and/or cosmetic benefits, including the prevention or treatment of diseases and disorders, including fatigue, insomnia, effects of aging, memory loss, mood disorders, cardiovascular disease and high levels of cholesterol in the blood, diabetes, osteoporosis, inflammation and autoimmune disorders, as well as improving or maintaining the appearance of the human body. For the avoidance of doubt, Nutraceuticals includes compounds that can be used as supplements to food or beverage, whether a solid formulation, capsule, tablet, liquid formulation, solution or suspension.

"Person" means an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association or any other entity.

"Sweetener" means any and all compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) that increase the sweetness of taste. Examples of Sweeteners include the sugars sucrose, fructose, glucose, high fructose corn syrup (containing fructose and glucose), tagatose, galactose, ribose, xylose, arabinose, and rhamnose, the sugar alcohols erythritol, xylitol, mannitol, sorbitol, and inositol, artificial sweeteners AceK, aspartame, neotame, sucralose, and saccharine, monatin, thaumatin, monellin, brazzein, trilobatin, stevia glycoside derivatives such as, for example, Rebaudioside A, Rebaudioside B, Rebaudioside C, Rebaudioside D, Rebaudioside E, Rebaudioside M, Rebaudioside N, Rebaudioside O, Rebaudioside Q, Rebaudioside X, Rebaudioside Z, dulcoside A, rubusoside, steviolbioside, NarDHC, NDHC, mogroside IV, mogroside V, Lo Han Guo, and similar compounds, stevio glycoside extracts and combinations of one or more of these sweeteners. A Sweetener (e.g., a Steviol Glycoside extract such as "Juno", Rebaudioside A, Rebaudioside

E, mogroside V, rubusoside, NarDHC and similar compounds) may become a Sweetener Modifier depending on the dosage level used.

"Sweetener Modifier" means any and all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) which increase, augment, intensify, accentuate or magnify the sensory perception of one or more sweetness characteristics of an orally consumable product without changing the nature or quality thereof as compared to a corresponding orally consumable product that does not contain such compound or Ingredient.

"Thermogenesis Agent" means a Functional Ingredient which, when delivered in an effective amount, activates or enhances a person's thermogenesis or metabolism.

"Trade Secrets" means any and all technical and operational information, including product formulae, customer lists, marketing strategies, cost and price information, processes, management methods and production methods, in each case which is (i) not generally known to the public, (ii) which has economic value or provides a competitive advantage and/or (iii) which the owner has taken measures to keep secret.

"Transfer" means to transfer, sell, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of all or any portion of the ownership interest or other rights in question, irrespective of whether any of the foregoing are effected voluntarily or involuntarily, directly or indirectly, by merger, sale of equity, operation of law or otherwise. The terms "Transferred," "Transferor," "Transferee" and similar variations shall have correlative meanings.

"Weight Management Agent" means an appetite suppressant, appetite satiation composition, satiety agent, satiety ingredient or a Thermogenesis Agent, including Functional Ingredients that, when delivered in an effective amount, suppress, inhibit, reduce or otherwise curtail a person's appetite.

Section 1.02   Construction.

a. For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions, and to Exhibits and other attachments, without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of, and Exhibits and other attachments to, this Agreement; (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection; (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation" (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (vii) reference to any law, rule or regulation means such law, rule or regulation as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including all rules and regulations promulgated thereunder, and reference to any section or other provision of any law, rule or regulation means that provision of such law, rule or regulation from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (viii) the word "Dollars" or "$" means Dollars of the United States of America; and (ix) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

b. For purposes of this Agreement, any reference to a defined term in or provision of any Ancillary Agreement that shall have been terminated as of any date of determination shall, to the extent consistent with the substantive effect of such termination, be deemed to be a reference to such defined term or provision as in effect immediately prior to the termination of such Ancillary Agreement.

c. For the purposes of this Agreement, although the Company would be an Affiliate and Controlled Affiliate of each of Givaudan and Blue Cal, the Parties have agreed that the Company shall not be treated as such for the purposes of this Agreement or any of the Ancillary Agreements.

Section 1.03   <u>Hierarchy</u>

a.  The terms of this Agreement and the BGN Distribution Agreement shall replace and supersede the BGN Tech Agreement.

b.  In the event of a conflict between the terms of the BGN Tech Agreement, the BGN Distribution Agreement, and this Agreement, the terms of this Agreement shall control. The rights of Blue Cal and Givaudan, respectively, obtained via the BGN Distribution Agreement are subject to any express limitations provided for in this Agreement.

**Article II**

**<u>Core IP License</u>**

Section 2.01   <u>Core IP License Grant</u>

a.  Blue Cal hereby grants to Givaudan and its Affiliates a perpetual, worldwide, transferable, royalty-free, sublicensable, exclusive (even as to Blue Cal) license to Commercially Exploit the Core IP within the Field.

b.  The Core IP includes, but is not limited to, the patents and Know-How listed in <u>Appendix A</u>.

c.  Blue Cal shall take all steps necessary to enforce, maintain, defend, protect and prosecute all items included in the Core IP, as further detailed in Section 2.02 and Section 2.03.

Section 2.02   <u>Maintenance</u>

a.  Blue Cal shall provide reasonable cooperation to Givaudan to (x) maintain all registrations of Core IP in full force and effect, (y) prosecute all pending applications related to the Core IP, and (z) maintain all microbial strain deposits related to the Core IP. Blue Cal shall (i) keep Givaudan informed of all developments in connection with the prosecution and maintenance of any registration or application, including any opposition or other challenge by any other Person to the ownership or validity of any Core IP or any registration or application thereof; (ii) promptly provide to Givaudan a copy of any correspondence or submission with or by any relevant governmental authority or any local registry or any other Person; (iii) consult with Givaudan concerning any decisions that could affect the scope or enforcement of any Core IP or the potential abandonment of such Core IP; and (iv) allow Givaudan access at

reasonable times to review any prosecution, maintenance, and deposit records of the Core IP.

b.  Givaudan shall, at its discretion, make payment of any maintenance fees on the Core IP. If Givaudan decides not to pay maintenance fees on any Core IP, it shall provide notice to Blue Cal prior to the deadline for payment of the fees.

c.  If Blue Cal, for any reason wishes to discontinue prosecution or maintenance of any Core IP pursuant to this Section, it shall, inform Givaudan, in writing, of its intention at least three (3) months prior to doing so. Givaudan may decide in its sole discretion whether to prosecute or maintain such Core IP in its name and at its sole cost. If Givaudan elects to pursue or maintain such Core IP, Blue Cal shall assign and transfer to Givaudan, for no additional fee or other consideration, all its rights to such Core IP free and clear of any and all liens.

d.  Blue Cal shall transfer the strain deposits listed on Annex III, all documentation (including strain viability test results) and authorizations necessary to access and use them, and all right, title and interest thereto to Givaudan within sixty (60) days from the Effective Date, after which Givaudan shall, at its discretion, maintain certain strains either as deposits, on site, or elsewhere or cease maintenance of the strains.

Section 2.03   Enforcement

a.  If Blue Cal becomes aware of any suspected infringement of any Core IP by a third party in the Field, or (b) any claim that any Core IP is invalid or unenforceable, Blue Cal shall promptly notify Givaudan and provide it with all details of such infringement, allegation or claim, as applicable, that are known by Blue Cal.

b.  Blue Cal may bring an infringement action to enforce any Core IP, defend any declaratory judgment action concerning any Core IP, and take any other lawful action reasonably necessary to protect, enforce, or defend any Core IP, and control the conduct thereof. Notwithstanding the foregoing, if Blue Cal does not bring action with respect to any commercially significant third-party infringement within thirty (30) days of a request by Givaudan, or earlier notifies Givaudan in writing of its intent not to do so, then Givaudan shall have the right, but not the obligation, to bring such an action and to control the conduct thereof at its own expense.

c.  In the event a Party undertakes the enforcement or defense of any Core IP in accordance with this Section: (i) the other Party shall provide all reasonable cooperation and assistance, at the enforcing Party's expense, including providing access to relevant documents and other evidence, making its employees available at reasonable business hours, and being joined as a party to such action as necessary to establish standing/solely if a court of competent jurisdiction determines the other Party is an indispensable party; (ii) any recovery, damages, or settlement derived from such suit, action, or other proceeding will be applied first in satisfaction of any costs and expenses, including reasonable attorneys' fees, of the enforcing Party, with any remaining amounts distributed to the enforcing Party. The enforcing Party may not settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, in a manner that adversely affects the rights of the other Party concerning the Core IP without such Party's prior written consent.

## Article III

### Non-Core IP License

Section 3.01   Non-Core IP License Grant

a.  Blue Cal hereby grants to Givaudan and its Affiliates a perpetual, worldwide, transferable, royalty-free, sublicensable (subject to 3.01(b)) non-exclusive license to use the Non-Core IP within the Field, to the extent such use is reasonably necessary for Givaudan's and/or its Affiliates' Commercial Exploitation of the Company Developed IP and/or the Core IP.

b.  The Non-Core IP includes, but is not limited to, the patents and Know-How listed in Appendix B.

c.  Notwithstanding the license of 3.01(a), any sublicense (other than sublicenses in the ordinary course of business) by Givaudan of the Non-Core IP to any Person (other than Givaudan's Affiliates) shall require a royalty to be paid by Givaudan to Blue Cal in an amount to be determined by the Parties after good-faith negotiations within customary industry parameters. If the Parties cannot agree on an appropriate royalty fee within a period of up to thirty (30) days from the date on which Givaudan provided Blue Cal with notice of its intent to sublicense, than the royalty shall be determined in accordance with the IP Arbitration Procedures defined in the BGN Tech LLC Agreement.

## Article IV

14

**Company Developed IP**

Section 4.01   Company Developed IP License Grant

a.  Blue Cal hereby grants to Givaudan and its Affiliates a non-exclusive, royalty-free, perpetual, worldwide, non-transferable, sublicensable right to use the Company Developed IP for itself (including its respective Affiliates) to (1) Commercially Exploit the Company Developed IP and (2) further develop the Company Developed IP and develop its respective Further IP.

b.  Givaudan hereby grants to Blue Cal and its Affiliates a non-exclusive, royalty-free, perpetual, worldwide, non-transferable, sublicensable right to use the Company Developed IP for itself (including its respective Affiliates) to (1) Commercially Exploit the Company Developed IP and (2) further develop the Company Developed IP and develop its respective Further IP.

c.  The Company Developed IP includes, but is not limited to, the patents and Know-How listed in Appendix C.

d.  Each of Blue Cal and Givaudan agrees that it shall never challenge the validity of the other's joint ownership in the Company Developed IP.

e.  If either Blue Cal or Givaudan learns of any unauthorized use of any portion of the Company Developed IP by any third party, then it shall promptly notify the other Party of such unauthorized use, and Blue Cal and Givaudan shall mutually take such steps as are commercially reasonable for each Party against the unauthorized user to stop the unauthorized use (including by mutually selecting counsel and sharing the expenses and proceeds arising out of any claims in connection with such unauthorized use).

f.  Neither Blue Cal nor Givaudan shall have the right to license (other than as specified in Sections 4.01(a), 4.01(b) or 5.01(a)), lease or otherwise Transfer or grant any rights or make any covenants to any third party relating to all or any portion of such Party's interest in the Company Developed IP without the other Party's prior written consent. Each of Blue Cal and Givaudan agrees to keep the Company Developed IP and all information related thereto strictly confidential and shall only disclose such information to third parties on a need-to-know basis.

g.  Each of Blue Cal and Givaudan agrees to cooperate in the filing and prosecution of any patent applications for the Company Developed IP. All filing and maintenance costs relating to Company Developed IP, to the extent that the Parties agree to file and maintain, shall be borne equally by the Parties. Either

Party may request that a patent application be filed on the Company Developed IP and the non-requesting Party shall consider such request in good faith. To the extent the Parties do not both agree that a patent application should be filed on the Company Developed IP, no patent application shall be filed. If the Parties elect to file a patent application, the Parties agree that Givaudan shall promptly prepare, file, and prosecute such patent applications in the names of the Parties jointly. In connection with the foregoing, Blue Cal agrees to promptly supply to Givaudan with all information necessary to prepare, file, and prosecute such patents. If either Party elects to discontinue paying costs associated with any patent or patent application filed pursuant to the provisions of this Section, it shall inform the other Party, in writing, of its intention at least three months prior to the time it intends to discontinue such payment so as to enable the non-discontinuing Party to decide whether to continue preparing or prosecuting such patent application or maintaining such patent at its own cost. The nondiscontinuing Party shall decide in its sole discretion whether to pursue or maintain such patent application or patent at its sole cost. If the nondiscontinuing Party elects to pursue or maintain such patent application or patent, the discontinuing Party agrees to assign and transfer to the nondiscontinuing Party, for no fee or other consideration, all its rights to the patent application or patent concerned free and clear of any and all liens.

## Article V

## Further IP

Section 5.01   Rights and obligations to Further IP

a. If at any time or from time to time, either Blue Cal or Givaudan develops any Further IP (the "Further IP Owner"), then either Blue Cal or Givaudan, as applicable, shall have the first right (but not the obligation) to license such Further IP from the Further IP Owner upon such terms and conditions as Blue Cal and Givaudan shall mutually agree; provided, however, that if Blue Cal and Givaudan are unable to agree upon such terms and conditions within a reasonable period of time after the development of such Further IP, then either Givaudan or Blue Cal, as applicable, shall have the right to enter into a licensing arrangement with another Person(s) pursuant to which such Person(s) would license such Further IP, in each case subject to compliance with all of the other terms and conditions of this Section. Prior to entering into any licensing arrangement with any other Person(s) (each such Person, a "Proposed Further IP Licensee") regarding the licensing of the applicable Further IP, the Further IP Owner shall provide either Blue Cal or Givaudan, as applicable, with written notice thereof, together with a copy of all draft definitive documentation (as applicable, the "Proposed Further IP

<u>License Agreements</u>") regarding such licensing arrangement and a summary of all material terms and conditions thereof, including with respect to term, pricing and royalties, as applicable. Blue Cal or Givaudan, as applicable, shall have the right (but not the obligation) at any time on or prior to the date that is sixty (60) days from the date of receipt of all such Proposed Further IP License Agreements to elect to license such Further IP upon the same material terms and conditions set forth therein by providing written notice of such election (the "<u>Further IP Election Period</u>"). If such Party waives its right to license such Further IP (or fails to provide notice of election to exercise such right on or prior to the last day of the Further IP Election Period), then the Further IP Owner shall have the right to enter into the licensing arrangement with the Proposed Further IP Licensee on the terms and conditions set forth in the applicable Proposed Further IP License Agreements; provided, however, that if the Further IP Owner and the Proposed Further IP Licensee do not consummate the transactions contemplated by such Proposed Further IP License Agreements within ninety (90) days after the end of the Further IP Election Period, then the Further IP Owner shall not enter into any such arrangement or commitment with any Person without first offering Blue Cal or Givaudan, as applicable, an opportunity to license the applicable Further IP in accordance with the procedure described in this Section.

## Article VI

## Blue Cal Background Licensed IP and Blue Cal Future Licensed IP

Section 6.01   <u>Termination of licenses to Blue Cal Background Licensed IP and Blue Cal Future Licensed IP</u>

a.   Effective as of the effective date of the BGN Distribution Agreement, and subject to the terms of this Agreement, any Blue Cal Future Licensed IP License and any Blue Cal Background Licensed IP License shall terminate.

## Article VII

## Term

Section 7.01   <u>Term</u>

a.   This Agreement shall commence as of the Effective Date and with respect to any patent license granted hereunder shall continue until the date upon which such patent expires, and with respect to any licensed patent application upon the expiration of the last patent to issue that claims priority to such licensed patent application.

b.  The Agreement shall continue and remain in full force and effect perpetually with respect to all other intellectual property rights licensed hereunder.

## Article VIII

## Confidentiality

Section 8.01    Confidentiality.

a.  Each of the Parties acknowledges that, from time to time, it and its Affiliates may receive information from or regarding the other Party (or its Affiliates) in the nature of trade secrets or that otherwise is confidential, including the terms of this Agreement ("Confidential Information"), the release or disclosure of which could be damaging to the other Party (or its Affiliates), or Persons with which it does business.

b.  Each Party receiving any Confidential Information (each, a "Receiving Party") shall hold in strict confidence any Confidential Information it receives with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature, but in no event less than a reasonable degree of care; provided, that a Receiving Party may disclose such Confidential Information to any Affiliate or professional advisor of such Receiving Party that agrees to abide by the restrictions in this Section 8.01; provided, further, that a Receiving Party may disclose such Confidential Information to the extent required by any legal, accounting or regulatory requirements (including the requirements of any securities exchange) or in connection with enforcing its rights under this Agreement or the Ancillary Agreements; and provided, further, that the Receiving Party disclosing such Confidential Information shall be responsible for any breaches of confidentiality by any such Affiliate or professional advisor of such Receiving Party.

c.  The restrictions in this Section 8.01 shall not apply to any Confidential Information to which the Receiving Party can demonstrate that such Confidential Information: (i) is or became public knowledge through no action of such Receiving Party or its Affiliates, officers, directors, representatives or agents in violation of this Agreement; (ii) has been provided to such Receiving Party without restriction by an independent third party who has not, directly or indirectly, received such Confidential Information from such Receiving Party (or the Company); (iii) was properly in the possession of such Receiving Party prior to the time of receipt of such Confidential Information; (iv) is required to be disclosed by law, regulation or court order (provided, that such Receiving Party shall notify the Board promptly of any request for that Confidential Information, before disclosing it if practicable); (v) was developed independently by such

Receiving Party in the course of work by employees or other agents of such Receiving Party without use of such Confidential Information; or (vi) has been provided to such Receiving Party independently of such Receiving Party's activities with respect to the Company.

## Article IX

## General Provisions

Section 9.01    General Provisions

a.   Amendment or Modification. This Agreement may be amended or modified only by written agreement of all of the Parties.

b.   Notices. Except as may otherwise be expressly set forth in this Agreement, the terms notice, notify and the like when used herein shall mean written notice (including facsimile or similar writing or electronic mail) and shall be sufficiently given if given to a Party at such Party's address or facsimile number or electronic mail address as set forth in Schedule 5 attached hereto, or such other address or facsimile number or electronic mail address as such Party may hereafter specify to the other Party for such purpose. Each such notice or other communication shall be effective:

    (1)   if given by facsimile, when such facsimile is transmitted to the facsimile number specified above and the appropriate confirmation is received;

    (2)   if given by electronic mail, when such electronic mail is transmitted to the electronic mail address specified above and the recipient confirms receipt by reply electronic mail;

    (3)   if given by mail, three (3) Business Days after such communication is mailed by registered or certified mail postage prepaid, addressed as aforesaid;

    (4)   if given by reputable national overnight courier, on the date of delivery as reflected in the records of such courier; or

    (5)   if given by any other means, when delivered personally to the Party or when delivered at the address specified above. Whenever any notice is required to be given by law or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

c. Public Announcements. All media releases, public announcements and public disclosures by any Party relating to this Agreement or the subject matter of this Agreement (including promotional or marketing materials) shall be coordinated with and subject to the approval of Givaudan and Blue Cal prior to release, other than any announcement intended solely for internal distribution within such Party's organization or any disclosure required by legal, accounting or regulatory requirements (including the requirements of any securities exchange).

d. Entire Agreement. This Agreement and the schedules, appendices and exhibits attached hereto, together with the BGN Distribution Agreement, embody the entire understanding and agreement among the Parties and supersede any prior understanding and agreement by or among the Parties, written or oral, relating to the subject matter hereof.

e. Waiver. No failure or delay on the part of any Party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedy that may be available to the Parties hereto at law, in equity or otherwise.

f. Injunctive and Other Relief. Each Party acknowledges and agrees on behalf of itself and its Affiliates that the rights afforded herein are unique and that any violation of this Agreement or the BGN Distribution Agreement may cause irreparable injury to the non-breaching Party for which monetary damages are inadequate, difficult to compute, or both. Accordingly, each Party expressly agrees that, in addition to any other remedies which the non-breaching Party may have, the non-breaching Party may be entitled to injunctive or other equitable relief for any breach or threatened breach of any term, provision or covenant of this Agreement or the BGN Distribution Agreement by the breaching Party. Nothing contained herein shall prevent or delay the non-breaching Party from seeking specific performance or other equitable remedies in any relevant jurisdiction (and a Party's breach in any jurisdiction shall be deemed a breach everywhere) in the event of any breach or intended breach by any Party of such Party's obligations hereunder or under the BGN Distribution Agreement. In addition, the non-breaching Party may bring an action on their own against the breaching Party with respect to any breach or bring any action as may be permitted to recover damages on behalf of the non-breaching Party.

g.   Dispute Resolution.  In the event of any dispute between the Parties, the Parties shall work together in good faith to resolve such dispute for such time as may be specified under the terms of this Agreement or as otherwise agreed by the Parties or, if no time limit is provided under this Agreement and the Parties cannot otherwise agree, then for thirty (30) days from the date of written notice by either Party first describing the applicable dispute. If the Parties are unable to resolve such dispute within the applicable period, a senior executive officer of each Party as may be designated by each Party from time to time (or an authorized representative thereof) (each such designee, a "Resolution Representative") shall meet, confer and discuss in person or by telephone conference in an attempt to resolve the dispute or deadlocked matter in good faith. If the Resolution Representatives of the Parties are unable to resolve such dispute within thirty (30) days following referral of such dispute pursuant to this Section, then such dispute be resolved in accordance with Section 9.01(h).

h.   Governing Law; Waiver of Jury. This Agreement and all claims and causes of action (whether in contract, tort or otherwise) shall be governed by and shall be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

i.   Consent to Jurisdiction and Service of Process. Subject to Section 9.01(g), any legal action, suit or proceeding arising out of or relating to this Agreement, or the breach, termination or validity thereof, shall be instituted in any state or federal court in the State of New York located in the County of New York. Each Party agrees not to assert, by way of

motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement, the agreements contemplated hereby or the subject matter hereof or thereof may not be enforced in or by such court. Each Party further irrevocably submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any Party if given by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such Party as herein provided.

j.   Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

k.   Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Party shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions. To the extent any license granted under this Agreement is to Know-How, the Party granting the license agrees to provide the other Party documentation and descriptions reasonably sufficient to Commercially Exploit such Know-How.

l.   No Third-Party Beneficiaries. The provisions hereof are solely for the benefit of the Parties and are not intended to, and shall not be construed to, confer a right or benefit on any creditor (in its capacity as such) any Party or any other Person.

m.  Delivery by Facsimile. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or facsimile delivered by electronic mail (a "pdf file"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original

22

signed version thereof delivered in person. At the request of either Party hereto or to any such agreement or instrument, and without affecting the effectiveness of any previous execution thereof by facsimile or pdf file, the other Party shall re-execute original forms thereof and deliver them to the other Party. Neither Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or pdf file to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or pdf file as a defense to the formation of a contract and each such Party forever waives any such defense.

n.  Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signing Parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

o.  No Presumption. With regard to each and every term and condition of this Agreement and any and all agreements and instruments subject to the terms hereof (including the BGN Distribution Agreement), the Parties hereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the Parties hereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto (including the BGN Distribution Agreement), no consideration will be given to the issue of which Party hereto actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto (including the BGN Distribution Agreement).

p.  Expenses. Each Party shall bear all of its own expenses incurred in connection with the preparation, execution and performance of this Agreement, the BGN Distribution Agreement and any amendments, modifications or supplements thereto, except where expressly provided herein.

q.  Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

r.  Bankruptcy Provisions. It is intended by the Parties to this Agreement that in the event of a Party's bankruptcy filing under the United States Bankruptcy Code ("Bankruptcy Code'), this Agreement shall be treated as

an executory contract under which such Party is a licensor of "intellectual property" as that term is defined under Section 365(n) of the Bankruptcy Code, and that the other Party shall have all the rights to which licensees of intellectual property are entitled to under such section.

s. Assignment. Neither Party may assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without the other Party's written consent. This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective permitted successors and assigns.

## Article X

## BASF License

Section 10.01 <u>Resolution of dispute over BASF Agreement</u>

a. Conagen, Inc. and BASF SE entered into an agreement as of May 2019 ("<u>BASF Agreement</u>"), and there is a dispute between the Parties hereto with respect to whether the grant of rights under that agreement is in conflict with the BGN Tech LLC Agreement.

b. In full resolution of that dispute, the Parties hereby agree

    i. That any IP specifically licensed in the BASF Agreement that would otherwise fall within the definition of Core IP in this Agreement is expressly carved out from the definition of Core IP in this Agreement.

    ii. Blue Cal on behalf of it and its Affiliates and/or Conagen agree to pay 50% of all royalties on Net Sales received from BASF as defined in Section 3 of the BASF Agreement, which shall include the running royalty or applicable Minimum Annual Royalty.

        1. Blue Cal on behalf of it and its Affiliates and/or Conagen will make such payments to Givaudan within thirty (30) days of receiving the royalty payment from BASF, and shall provide a copy of the BASF written report contemplated by Section 3.4 of the BASF Agreement, redacted where necessary but including the total payment information, covering such royalty payments within thirty (30) days of receiving such written report from BASF.

        2. Blue Cal on behalf of it and its Affiliates and/or Conagen shall keep and maintain records of all royalty payments and

royalty statements made by BASF under the BASF Agreement.  Such records shall be open to inspection during business hours for a three (3) year period after the end of the payment period to which such records relate, but in any event not more than once per calendar year by a nationally recognized independent certified public accountant selected by Givaudan to whom Blue call has no reasonable objections and retained at Givaudan's expense. Said accountant shall sign a confidentially agreement prepared by Givaudan and reasonably acceptable to Blue Cal and if necessary BASF and shall then have the right to examine the records.  If said examination reveals any underpayments, then Blue Call shall promptly pay the balance due to Givaudan and if the underpayments are more than five percent (5%), then Blue Cal shall pay the balance due and the expenses of said examination to Givaudan.  If said examination reveals any overpayment of royalty payable, then Givaudan shall credit the amount overpaid against Blue Cal's future royalty payments.  In the even the audit reveals an inaccuracy to the disadvantage of Givaudan of less than five percent (5%) or an overpayment then Givaudan shall bear the costs of the examination.

3.  Within thirty (30) days of the Execution Date of this Agreement, Blue Cal shall provide Givaudan with an accounting of royalty payments made by BASF to date and make payment to Givaudan of 50% of such payments.


[INSERT SIGNATURE PAGES]

**SCHEDULE 1**

| Patent No | Patent Title | Filing Date |
|---|---|---|
| US61/898, 571 | Recombinant production of Steviol Glycoside using a specific UGT gene | 1 November 2013 |
| US61/899, 529 | Crystal Structure of Ferulic Acid Decarboxylase (FAD) | 4 November 2013 |
| US61/898,944 | Method of using Acyl-CoA Synthetase for Biosynthetic Production of Acyl-CoAs | 1 November 2013 |
| US61/898, 899 | Method of using O-Methyltransferase for Biosynthetic Production of Pteroostilbene | 1 November 2013 |
| | Resveratrol | To be confirmed (if any) |

**SCHEDULE 2A**

| | | |
|---|---|---|
| **US 61/899456** | High yield biosynthesis of Ferulic Acid from Eugenol using a Plant Dehydrogenase | 4 November 2013 |
| **US 61/747,682** | High yield biosynthesis of ferulic acid using a modified caffeic acid 3-O-methyltransferase | 31 December 2012 |
| **PCT/US13/78328 PCT International Patent Application** | Methods of making vanillin via microbial fermentation utilizing Ferulic Acid provided by a modified caffeic acid 3-O-Methyltransferase | 30 December 2013 |
| **[CN102321563B] Granted CN patent**<br><br>**US2013/0115667A1 Pending US patent application**<br><br>**US13/591,231 US Provisional Patent Application** | Amycolatopsis Sp, strain and methods of using the same for vanillin production | CN priority date is 24 October 2011<br><br>US Filing date is 22 August 2012 |
| **US61/898,961 US Provisional Patent Application** | Method of using Lipase for Biosynthetic Production of Cis-3-Hexenol | 1 November 2013 |

27

**SCHEDULE 2B**

Wholly-Owned Blue Cal IP

1.  All Intellectual Property, Trade Secrets and Know-How relating to the starting materials, method for marking, methods of using, methods of purifying, downstream processing of and compositions comprising Natural Vanillin and Cis-3-Hexenol, including:

    a.  Any Intellectual Property disclosed in or relating to the "Standard Operating Procedure" documents for the following four processes:

        i.   Process I: extraction of Ferulic Acid (FA) from Corn;

        ii.  Process II: bioconversion of p-coumaric acid to caffeic acid to Ferulic Acid (FA);

        iii. Process III: bioconversion of Eugenol to Ferulic Acid; and

        iv.  Process IV: bioconversion of Ferulic Acid (FA) to Natural Vanillin (NV);

    b.  The following microbial strains located in the Chinese Cell and Tissue Culture Collection, including any Intellectual Property therein or appurtenant thereto:

        i.   CCTCC M 2011265;

        ii.  CGMCC 7.176;

        iii. CGMCC 7.177; and

        iv.  CGMCC 7.178;

2.  All Intellectual Property created in connection with the Engineered Amycolatopsis microbial strain useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and

3.  To the extent not already included in the Blue Cal Initial Contributed IP, any Know-How included in any revisions or supplements to the following patent application:

| Patent No | Patent Title | Filing Date | Company Product |
|---|---|---|---|
| US 61/899456 | High yield biosynthesis of Ferulic Acid from Eugenol using a Plant Dehydrogenase | 4 November 2013 | Natural Vanillin (NV) |

Co-Owned Blue Cal IP

1.  Blue Cal's right, title and interest in and to all Intellectual Property created in connection with the JTDA, including any and all Intellectual Property disclosed or included in the following document: Standard Operating Procedure of cis-3-Hexenol production from alpha- linoleic acid in Saccharomyces cerevisiae and Yarrowia lipolytica" dated June 6 2014 by Hui Chen, Tim Seeback and Huimin Man; and

2.  To the extent not already included in the Blue Cal Initial Contributed IP, any Know-How included in any revisions or supplements to the following patent application:

| Patent No | Patent Title | Filing Date | Company Product |
|---|---|---|---|
| US61/898961 US Provisional Patent Application | Method of using Lipase for Biosynthetic Production of Cis-3-Hexenol | 1 November 2013 | Cis-3-Hexenol (C3H) |

**SCHEDULE 3**

| Patent No | Patent Title | Filing Date | Applicant | Company Product |
|---|---|---|---|---|
| US61/837,097 | Rebaudioside E and Food Products sweetened with Rebaudioside E | 19 June 2013 | PhytoTech Corp | Use of RebE as a sweetener (claims 1-15) |
| US61/837,097 | Rebaudioside E and Food Products sweetened with Rebaudioside E | 19 June 2013 | PhytoTech Corp | Use of RebE as a sweetener enhancer/modifier (claims 16-28) |
| N/A | "Secret" UGT gene and its applications in making various Rebaudioside products (eg RebE, RebM, RebZ) and uses thereof | To be confirmed (if any) | Conagen | "Secret" UGT gene and its applications in making various Rebaudioside products (eg RebE, RebM, RebZ) and uses thereof |
| N/A | Raspberry Ketone Production System | To be confirmed (if any) | Conagen | A biotransformation/ Bioconversion process for making Raspberry Ketone |

**SCHEDULE 4**

**[Purposefully Blank]**

**SCHEDULE 5**

**[CONTACT INFORMATION TO BE ENTERED]**

# Appendix A

**Index of Core IP**

| <u>Annex No.</u> | <u>Contents</u> |
|---|---|
| I. | BGN Patent Families including BGN Granted Patents |
| II. | BGN Standard Operating Procedures |
| III. | Microbial Deposits Relating to BGN Patent Families |
| IV. | List of BGN Agreements Relating to Natural Vanillin |
| V. | Blue Cal BGN Contributed IP |

Annex I.

**BGN Patent Families including BGN Granted Patents**

**All of the following patents and patent applications and any Know How, Trade Secrets or other Intellectual Property relating to the patents and patent applications is Core IP:**

**BGN Patent Family Overview**

| Givaudan BGN Ref No | Priority Application number | Patent Title | publication no/date |
|---|---|---|---|
| 30714 | US61/747,682<br>31 December 2012 | Methods of making vanillin via microbial fermentation utilizing Ferulic Acid provided by a modified caffeic acid 3-O-Methyltransferase | WO2014106189 |
| 30715 | US61/898,961<br>1 November 2013 | Method of using Lipase for Biosynthetic Production of Cis-3-Hexenol | |
| 30747 | CN201110325488<br>24 October 2011 | *Amycolatopsis Sp, strain* and methods of using the same for vanillin production from ferulic acid | CN102321563B1<br>(3 April 2013)<br>US9115377B2<br>(25 August 2015)<br>US9758759B2<br>(12 Sept 2017)<br>US9822335B2<br>(21 Nov 2017)<br>US10351817B2<br>(16 July 2019) |
| 30748 | US 61/899456<br>4 November 2013 | High yield biosynthesis of Ferulic Acid from Eugenol using a Plant Dehydrogenase | WO2015/066722<br>EP3066206B1<br>(12 Dec 2018)<br>JP6596009B1<br>(4 October 2019)<br>US9932610B2<br>(3 April 2018)<br>US10428356B2 |

| | | | |
|---|---|---|---|
| | | | **(**1 October 2019)<br>**CN20140060464X**<br>(26 Jan 2021)<br>**IN347620**<br>(24 Sept 2020)<br>**HK1226445B**<br>(4 June 2021) |

**BGN 30747  Patent Family**

| Givaudan Ref No | US/CN Patent App no | US/CN Granted Patent |
|---|---|---|
| **30747CN** | CN201110325488.1<br>(24 Oct 2011) | **CN102321563B1**<br>(3 April 2013) |
| **30747US** | US13/591, 231<br>(22 August 2012) | **US9115377B2**<br>(25 August 2015)<br><br>RF due 15 August 2018 plus 6 months = 25 Feb 2019 |
| **30747US/2** | US14/800, 261<br>(25 July 2015) | **US9758759B2**<br>(12 Sept 2017) |
| **30747US/3** | US15/602, 606<br>(23 May 2017) | **US9822335B2**<br>(21 Nov 2017) |
| **30747US/4** | US15/787,372<br>(18 Oct 2017) | **US10351817B2**<br>(16 July 2019) |

**BGN 30748  Patent Family**

| Giv BGN Ref | Patent No | Application No | Granted Date |
|---|---|---|---|
| 30748PCT | WO2015/066722 | PCT/US2014/063952 | |
| 30748EP | EP3066206B1 | 14802286.6 | 12 December 2018 |
| 30748JP | JP6596009B1 | 2016-553222 | 4 October 2019 |
| 30748US/2 | US9932610B2 | US15/033,980 | 3 April 2018 |
| 30748US/3 | US10428356B2 | US15/879341 | 1 October 2019 |
| 30748US | | US61/899456 | |
| 30748IN | IN347620 | 201647015455 | 24 September 2020 |
| 30748CN | 106,103,724B | 201480060464X | 28 January 2021 |
| 30748HK | 1226445B | 16114733.5 | 4 Jun 2021 |

**ANNEX II.**

**BGN Standard Operating Procedures**

**All Intellectual Property relating to the below Standard Operating Procedures ("SOPs") is Core IP:**

| SOP Process | Description | Givaudan BGN patent ref | Givaudan SOP receipt date |
|---|---|---|---|
| Process I | Extraction of Ferulic Acid (FA) from Corn | BGN 30714 | 15 August 2014 |
| Process II | Bioconversion of p-coumaric acid to caffeic acid to Ferulic Acid (FA) | BGN 30714 | 15 August 2014 |
| Process III | Bioconversion of Eugenol to Ferulic Acid; | BGN 30748 | 27 August 2014 |
| Process IV | Bioconversion of Ferulic Acid (FA) to Natural Vanillin (NV) | BGN 30747 | 3 October 2014 |
| Process V | Juno specification and process for making | | 25 May 2015 |
| Process VI | cis-3-hexenol production from α-linolenic acid in Saccharomyces cerevisiae and Yarrowia lipolytica | BGN 30715 | 6 June 2014 |
| Process VII | Engineered (ie recombinant) Amycolatopsis microbial strain useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and | BGN 30748 | |

37

**ANNEX III.**
**Microbial Deposits relating to BGN Patent Families**

**All Intellectual Property relating to the following microbial strains is Core IP:**

| Strain no. | Strain | Patent related | Depositer name |
|---|---|---|---|
| Strain I | CCTCC M 2011265; | BGN 30747 | Jiangnan Uni |
| Strain II | CGMCC 7.176; | BGN 30748 | Wuxi New Way Fermentation Research Institute (WNWFRI) |
| Strain III | CGMCC 7.177 | BGN 30748 | Wuxi New Way Fermentation Research Institute (WNWFRI) |
| Strain IV | CGMCC 7.178; | BGN 30748 | Wuxi New Way Fermentation Research Institute (WNWFRI) |
| Strain V | Engineered (ie recombinant) *Amycolatopsis* microbial strain | BGN 30748 useful in the conversion of Eugenol to Ferulic Acid and/or Natural Vanillin; and | Wuxi New Way Fermentation Research Institute (WNWFRI) |

**Microbial strains are located in the Chinese Cell and Tissue Culture Collection (CCTCC) and China General Microbiological Culture Collection Center  (CGMCC).**

**Chart showing relevance/link of the BGN Strain Deposit to the relevant BGN Patent Family**

| *Strain No* | *Patent Title* | *Giv BGN Ref* | *Strain Type* | *Depositer* |
|---|---|---|---|---|
| **CCTCC M2011265** | US9115377B2 CN102321563B1 | **BGN 30747** | *Amycolatopsis* WT variant (not recombinant) | Jiangnan Uni |
| **CGMCC 7.176** | WO2015/066722 | **BGN 30748** | Recombinant *E.coli* (BL21) | WNWFRI* |
| **CGMCC 7.177** | WO2014/106189 | **BGN 30748** | Recombinant *E.coli* (BL21) | WNWFRI |
| **CGMCC 7.178** | WO2014/106189 | **BGN 30714** | Recombinant *E.coli* (BL21) | WNWFRI |

- **WNWFRI = WUXI NEW WAY FERMENTATION RESEARCH INSTITUTE (BLUE CAL AFFILIATE)**

**Annex IV.**

**List of BGN Agreements Relating to Natural Vanillin IP**

**Any IP developed under the following agreements is Core IP:**

| Givaudan Ref | Project | Agreement |
|---|---|---|
| E2580 | BGN Natural Vanillin (NV) | Givaudan-BGN Technical Development Agreement (TDA) 31 March 2015<br><br>BGN-Conagen Research Services Agreement (RSA) 31 March 20215<br><br>BGN- Teejoy Technology Licensing Contract (TLC) 1 June 2015<br><br>BGN-Wuxi New Way Biotech Co Ltd Technology Licensing Contract (18 June 2015) |

**ANNEX V.**
**BLUE CAL CONTRIBUTED IP**

**Materials in Schedules 2A and 2B of the Post-Termination License.**

# Appendix C

**List of Company Developed IP**

All Intellectual Property developed under the following projects that is owned by BGN Tech pursuant to the applicable agreement:

| PROJECT | AGREEMENT |
|---|---|
| GAMMA OCTALACTONE | Givaudan-BGN MTA Dated 2 May 2016<br><br>BGN-Synthace MTA dated 26 April 2016<br><br>BGN-Synthace Research Services Agreement (RSA) dated 20 July 2016 |
| DELTA DODECALACTONE (DDDL) | UFS and BGN Tech Non Disclosure Agreement (NDA) signed 29 September 2016<br><br>DEC. 2016, BGN – USF (South Africa) JDA requested (Delta-DoDecalactone – DDDL) |
| | |